# EXHIBIT 1



November 25, 2019

**Certified Mail, Return Receipt Requested**
**9214 8901 8607 7611 1230 91**

Lisa Bloom, Esq.
The Bloom Firm
20700 Ventura Blvd., Suite 301
Woodland Hills, CA 91364

      Re:    Claim:      ***McGowan v. Weinstein, et al.***
                                U.S.D.C., Cent. Dist. of Cal. no. 2:19-cv-9105
              Insured:    The Bloom Firm, Lisa Bloom
              Insurer:     Associated Industries Insurance Co., Inc.
              Policy:      AES1053102 01
              Policy period:  May 19, 2019 – May 19, 2020
              Claim no.:   3164425-1

Dear Ms. Bloom:

    AmTrust Financial Services, Inc. administers claims for Associated Industries Insurance Company, Inc.  Timothy Jacobs is the assigned claims handler for this matter.  Please address all future correspondence regarding this matter to his attention and reference the claim number above.  His contact information is below:

        Timothy Jacobs
        Claims Manager
        233 North Michigan Ave.
        Chicago, IL 60601
        (312) 803-6991
        Timothy.jacobs@amtrustgroup.com

    This letter serves as our formal response to the tender of the captioned lawsuit filed against you.

    We value you as a customer and appreciate your business.  Unfortunately, we have concluded that the damages alleged in the *McGowan v. Weinstein, et. al.* lawsuit (the McGowan lawsuit), captioned above, are not covered under the policy.  Therefore, we must respectfully disclaim any obligation to defend or indemnify you and the Bloom Firm in the McGowan lawsuit at this time.

We will, however, welcome any information that you may have that could affect this conclusion.  After you have reviewed this letter, if there is additional information you would like us to consider, please send it to me at the address listed above.  Also, if you have questions about the letter, please do not hesitate to call or write us.

The following presents our understanding of the facts surrounding the McGowan lawsuit and our position with respect to Associated's obligations.

The McGowan complaint.

Our understanding of the allegations from the McGowan lawsuit is as follows.  We understand that you may dispute many of the allegations in the lawsuit and we do not suggest that any of those allegations are true.  They are presented here only to illustrate the nature of the claims that have been asserted in the lawsuit.  For clarity, we sometimes refer to you in the third person.

On October 23, 2019, actress, Rose McGowan, filed her complaint against film producer Harvey Weinstein, along with lawyers David Boies and Boies Schiller Flexner LLP and Lisa Bloom and the The Bloom Firm, and an investigation firm called B.C. Strategies Ltd. dba "Black Cube." In this summary, we will refer to Lisa Bloom and the Bloom Firm as "Bloom."  We also leave out allegations against Weinstein and Boies not directed at Bloom. The charging allegations against Bloom largely turn on her secondary involvement in the supervision of the Black Cube agency, which allegedly intruded into McGowan's privacy through deceit and improperly obtained information about a book in the nature of a memoir McGowan was writing about, among other things, Weinstein.

McGowan alleges that years ago, when she was "a young, up-and-coming actress," Weinstein raped her and paid her a settlement.  (Complaint para. 4.)  In recent years, as news of Weinstein's proclivities circulated in the press, Weinstein and his co-defendants (including Bloom) conspired "to protect [his] reputation, suppress negative information about him, and silence and discredit his accusers."  (Para. 5.)  The latter included McGowan, who in 2016 began a memoir called *Brave* recounting these events and eventually published in 2018.  (Para. 6.)  The defendants then conspired "to ensure that MCGOWAN's story never saw the light of day, and—if it did—that no one would believe her." (Para. 7.)  They allegedly "tried to steal MCGOWAN's unpublished book, attempted to buy MCGOWAN's silence, and planned—in the event that they could not intimidate MCGOWAN into withholding her book—to undermine MCGOWAN's reputation, such that she would not be believed." (Para. 8.)  As a result, she alleges "[h]er book sales suffered; her expenses mounted; her job opportunities vanished; and her emotional health cratered." (Para. 9.)

McGowan described defendant Boies as "an attorney who is both a high-stakes litigator and someone who serves clients in non-legal roles such as reputation management." (Para. 12.)  She described defendant Bloom as "an attorney … who also

is a television commentator and serves clients in multiple capacities, including in non-legal roles such as reputation management." (Para. 14.) Defendant Black Cube "is a private intelligence agency based in London" and "was founded in 2010 by former Israeli intelligence officers." (Para. 16.)

McGowan alleges that, "beginning in 2001, BOIES regularly performed reputation-management engaggements for WEINSTEIN, such as intervening on WEINSTEIN's behalf to try to kill negative stories about WEINSTEIN." (Para. 25.) Boies in turn engaged Black Cube under an alleged contract, "'to identify the entities behind the negative campaign against the Client'—WEINSTEIN—'and support the Client's efforts to put a stop to it.'" (Para. 38.) According to McGowan, the "contract was for $200,000 and provided for performance bonuses, including $200,000 if BLACK CUBE was successful in 'putting a stop to the negative campaign.'" (Para. 39.)

According to McGowan, Bloom joined the conspiracy in order to get Weinstein's help in having a book she had written about the Trayvon Martin affair into a television mini-series, all "[i]n exchange for BLOOM's help discrediting MCGOWAN." (Para. 50.) "[A]pproximately three months after she secretly joined his team of fixers, WEINSTEIN optioned the rights for BLOOM's book. BLOOM tweeted in excitement, 'BIG ANNOUNCEMENT: My book SUSPICION NATION is being made into a miniseries, produced by Harvey Weinstein and Jay Z!'" (Para. 50.)

More specifically, Bloom allegedly "pitched her reputation-management services in a letter to WEINSTEIN in or around December 2016." (Para. 51.) According to McGowan,

> In the letter, BLOOM did not give or receive legal advice and had not yet been retained by WEINSTEIN. BLOOM proposed in the letter that WEINSTEIN retain her to enhance his reputation and to destroy MCGOWAN's. Indeed, she outlined a detailed plan for damaging MCGOWAN, claiming that she was well-suited to advise on this topic given her extensive experience representing women who have been sexually assaulted.

(Para. 51.) "As BLOOM requested, WEINSTEIN connected her with DAVID BOIES so that she and THE BLOOM FIRM could get retained to manage WEINSTEIN's reputation." (Para. 53.) McGowan alleges that Bloom "joined BOIES and BOIES SCHILLER FLEXNER in overseeing BLACK CUBE's work and receiving reports, including from WEINSTEIN, about BLACK CUBE's activities." (Para. 54.)

McGowan then alleges a series of facts suggesting that her wallet had been stolen, planted with drugs, turned into airport police in D.C., and resulted in charges filed and a no-contest plea negotiated by her attorney, whom she later learned also represented Weinstein. (Paras. 55-61.) As to these, McGowan alleges that the "press surrounding the drug charges against MCGOWAN undermined her reputation and served, along with

other negative stories about MCGOWAN, to portray her as increasingly unglued, just as WEINSTEIN, BLOOM, BOIES, and BLACK CUBE set out to do." (Para. 62.)

McGowan then alleges that Black Cube approached her through a series of operatives, beginning when "literary agent Lacy Lynch connected her with Seth Freedman, whom she described to MCGOWAN as a freelance journalist from London," (Para. 64.) "Freedman pressed MCGOWAN for information about her book and what she planned to say in it." (Para. 65.) Freedman, however, "was being paid by BLACK CUBE to get information about MCGOWAN and her book," and "he was recording their call without MCGOWAN's consent." (Para. 67.)

Next, agent "Lynch contacted MCGOWAN to relay that BLOOM wanted to speak with MCGOWAN about WEINSTEIN. MCGOWAN's understanding from Lynch was that BLOOM wanted an opportunity to convince MCGOWAN that WEINSTEIN had changed, and he was now a family man who wanted to make amends. BLOOM did not reveal that she was actually on retainer as WEINSTEIN's reputation manager and advising him about how to discredit MCGOWAN. MCGOWAN declined to speak with BLOOM." (Para. 69.) The complaint does not allege that Bloom ever personally met with McGowan.

McGowan's most extensive contact with a Black Cube operative allegedly occurred when a woman called Diana Filip, supposedly affiliated with a London-based investment-management firm, contacted McGowan through her agent and said "her company was launching 'Women in Focus,' and stated, 'We have taken a keen interest in the work Ms. Rose McGowan does for the advocacy of women's rights, and we believe that the ideals she strives towards align closely with those upheld by our new initiative.'" (Para. 71.) Filip, however, "was actually Stella Penn Pechanac, a former Israeli intelligence officer who worked for BLACK CUBE." (Para. 73.) "Defendants' tactic in using a spy agency and sending in Filip as a women's rights activist and investor was especially coercive towards MCGOWAN. The entire Diana Filip identity was constructed to target MCGOWAN's vulnerabilities, falsely to secure her trust, and to coerce MCGOWAN into sharing information about her book and about WEINSTEIN." (Para. 74.)

McGowan alleges that, during "two meetings, MCGOWAN read Filip excerpts of her book, which she had not shared with anyone else at that time. During the May 13 meeting, MCGOWAN had her laptop with her, and Filip pressed to read an excerpt for herself. Again, even though MCGOWAN had not yet showed her draft to anyone else, MCGOWAN—believing Filip to be someone she was not—allowed her to read part of the book on MCGOWAN's laptop." (Para. 77.) McGowan alleges that "Filip was recording MCGOWAN throughout these meetings without her consent in order to compile hours of information that were then shared with WEINSTEIN, BOIES, BLOOM, and others." (Para. 78.) Thus, "through this deceptive and fraudulent behavior, Defendants succeeded in obtaining for WEINSTEIN more than a hundred pages of transcripts and descriptions of *Brave*, based on hours of recorded conversations between MCGOWAN and Filip." (Para. 79.) "WEINSTEIN, BOIES, and BLOOM—having listened to hours of MCGOWAN

recordings, including detailed excerpts of her book—wanted more information about what MCGOWAN might expose." (Para. 98.)

Thereafter, Boies and Black Cube allegedly "entered into a second contract on WEINSTEIN's behalf. This was no form agreement. It had nothing to do with litigation or anticipated litigation." (Para. 99.) Rather, it specified that their "main objectives" were to "(1) provide intelligence that will help WEINSTEIN's efforts to 'completely stop the publication of a new negative article in a leading NY newspaper,' and (2) '[o]btain additional content of a book [McGowan's] which is currently being written and includes harmful negative information' about WEINSTEIN. In the contract, BLACK CUBE promised to devote a 'full-time agent by the name of "Anna"' to the project for four months, as well as avatar operators, intelligence analysts, and others." (Para. 99.)

After this second contract, McGowan alleges that "BLOOM personally met with Filip during this time and discussed Filip's activities with WEINSTEIN." (Para. 102.) Filip then introduced McGowan to another Black Cube operative using the name Paul Laurent, supposedly a co-worker at the investment firm. (Para. 110.) Throughout their discussions, according to McGowan, "Filip and Laurent were recording MCGOWAN throughout these meetings without her consent in order to compile hours of information to be then shared with WEINSTEIN, BOIES, BLOOM, and others." (Para. 111.)

Among other things McGowan claims "a right of privacy, protected by Article 1, section 1 of the California Constitution," including " (a) informational *privacy*, meaning an interest in precluding the dissemination or misuse of sensitive and confidential information, and (b) autonomy privacy, meaning an interest in making intimate personal decisions or conducting personal activities without intrusion, observation, or interference. (Para. 182.) The specific interests she claims under these standards are the "privacy and confidentiality of her manuscript, *Brave*, before it was published" (Para. 183) and her "decisions about going public with information about WEINSTEIN's sexual assault." (Para. 184.) These privacy rights were violated, says McGowan, when "Harvey Weinstein, David Boies, Boies Schiller Flexner LLP, Black Cube, BLOOM, and THE BLOOM FIRM participated in and supervised an unreasonably obtrusive investigation of MCGOWAN that violated her informational privacy and her autonomy privacy. The investigation used sharp and illegal tactics like stalking MCGOWAN, illegally recording her, illegally downloading information from her computer, using operatives with fake identities to deceive her, and lying to her about BLOOM's motives and concealing BLOOM's representation of WEINSTEIN." (Para. 187, italics added.)

Based on these alleged facts, and more against Weinstein and Boies, McGowan alleged the following eleven claims against Bloom and the other defendants:

      1. Civil RICO, 18 U.S.C. § 1962(c)
      2. Civil RICO, 18 U.S.C. § 1962(d)
      3. Federal Wiretap Act, 18 U.S.C. § 2520
      4. Fraudulent Deceit, Cal. Civ. Code § 1709

      5. Common Law Fraud
      6. Bane Act, Cal. Civ. Code § 52.1
      7. Invasion of Privacy
      8. Computer Crimes, Cal. Civ. Code § 502(e)(1)
      9. Conversion
      10. Intentional Infliction of Emotional Distress
      11. Negligent Hiring and Supervision

Additional Facts

      We requested the alleged Bloom memo or letter to Weinstein in December 2016 and you referred us to a Twitter account (https://twitter.com/yashar/status/).  The two pages available there is similar to what McGowan alleged.  It lists six "options" for action by Weinstein.  In short, those options fell within these categories:  (1) "Initiating friendly contact with" McGowan; (2) "Counterops online campaign to push back and call her out as a pathological liar;"  (3) a "Cease and desist letter from me, warning her of the violation of agreement with you and putting her on notice of causes of action for CA claims of false light, invasion of privacy, defamation etc.;" (4) "a pre-emptive interview;" (5) "Start the Weinstein foundation, focusing on gender equality in film, etc."; (6) "Positive reputation management."

      You also provided a copy of Bloom's engagement letter of December 10, 2016, from Bloom to the Boies firm.  The letter begins "Thank you for entrusting The Bloom firm ... to provide Boies, Schiller & Flexner LLP with legal services."  The letter's provisions relating to scope of services say that that Bloom will "assist you in your representation of Harvey Weinstein ('HW') regarding some recent allegations made against him."  The letter notes that the "agreement does not cover litigation services of any kind ...."

      Finally, you also provided several invoices to Boies documenting the work performed.  Each entry in the invoices refers to the "project" as the "Weinstein-Media Matter."  Most refer to media evaluation, phone calls and meetings.  We note that, on Oct. 6 and 7, 2017, after responding to the NY Times and media, Ms. Bloom twice recorded time to "negotiate employment agreements."  On Oct. 5, 2017, Mr. Ellicott recorded time for "contract for Alexander and Clayton."  Also on that day Mr. Ellicott recorded phone calls "about cease and desist letter."

The Associated policy.

      Associated Industries Insurance Company, Inc., issued to The Bloom Firm a Lawyers Professional Liability Insurance Policy, policy no. AES1053102 01, in effect on a claims made and reported basis for the period May 19, 2019 to May 19, 2020, subject to a retroactive date of May 19, 2015.  The policy is subject to limits of $1 million each claim and in the aggregate, in excess of a self-insured retention of $25,000 for each claim. The policy also affords Network Security and Privacy Coverage with separate each-claim and aggregate limits of $250,000.

Letter: Lisa Bloom, Esq.
November 25, 2019
Page 7

As pertinent here, coverage form no. AES PL 005 01 14, includes the following language:

**I.   INSURING AGREEMENTS**

A. The **Company** shall pay **Damages** and **Claim Expenses,** in excess of the Self-Insured Retention identified in the Declarations, if applicable, and subject to the Policy's Limit of Liability, that the **Insured** shall become legally obligated to pay as a result of a **Claim** made against the **Insured** for a **Wrongful Act**, provided that (i) the **Claim** is first made against the **Insured** and reported to the Company, in writing, during the **Policy Period** or the Extended Reporting Period, if applicable; (ii) the **Insured** has no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy; and (iii) such **Wrongful Act** took place on or after the **Retroactive Date** set forth in the Declarations Page of this Policy and prior to the end of the **Policy Period**.

B. If Each Claim and Policy Period Aggregate limits have been purchased for Network Security and Privacy coverage as designated in the Declarations, the **Company** shall pay **Damages** and **Claims Expenses** resulting from any **Claim** first made against the **Insured** for a **Network Security Wrongful Act** or **Privacy Wrongful Act**, provided that (i) the **Claim** is first made against the **Insured** and reported to the Company, in writing, during the **Policy Period** or the Extended Reporting Period, if applicable; (ii) the **Insured** has no knowledge of such **Network Security Wrongful Act** or **Privacy Wrongful Act p**rior to the Inception Date of this Policy; and (iii) such **Network Security Wrongful Act** or **Privacy Wrongful Act** took place on or after the **Retroactive Date** set forth in the Declarations Page of this Policy and prior to the end of the **Policy Period**.

C. **Defense.** As part of and subject to the Policy's Limit of Liability, the **Company** shall have the right and duty to defend any **Claim** against the **Insured** to which this Policy applies, even if the allegations of the **Claim** are groundless, false, or fraudulent. However, the **Company's** duty to defend shall terminate upon exhaustion of the applicable Limit of Liability by the payment of **Damages** and/or **Claim Expenses.**

\* \* \*

**II.   DEFINITIONS**

Wherever used in this Policy:

\* \* \*

K.   **"Insured's Computer System"** means computers and associated software, input and output devices, data storage devices, networking equipment and back up facilities:

1. operated by and either owned by or leased to the **Insured**;
2. operated by a third party service provider and used for the purpose of providing hosted services to the **Insured** or for processing, maintaining, hosting or storing electronic data of the **Insured**, pursuant to a written contract with the **Insured** for such services.

**"Insured's Computer System"** shall also include the websites of the **Insured** and any data, text, sounds, graphics, images or similar matter stored thereon.

\* \* \*

N.   **"Network Security"** means those activities performed by the **Insured,** or by others for or on behalf of the **Insured,** to protect against **Unauthorized Access** to, **Unauthorized Use** of, or a **Denial of Service Attack** by a third party directed against, or the transmission of **Malicious Code** to, the **Insured's Computer System.**

O.   **"Network Security Wrongful Act"** means any actual or alleged act, error, omission, neglect, or breach of duty by an **Insured** or the **Insured's Service Provider,** which causes a breach of the **Insured's Network Security** that results in:

1. the theft, alteration, or destruction of electronic data on the **Insured's Computer System**;
2. the **Unauthorized Access** to or **Unauthorized Use** of the **Insured's Computer System**;
3. the denial of an authorized user's access to the **Insured's Computer System**, unless the denial of such authorized user's access is caused by a

    mechanical or electrical failure outside the control of the **Insured**;

4.  the participation by the **Insured's Computer System** in a **Denial of Service Attack** directed against a third party's **Computer System**; or

5.  the transmission of **Malicious Code** from the **Insured's Computer System** to a third party's **Computer System**.

P.  **"Personal Information"** means:

1.  an individual's name, social security number, medical or healthcare data, other legally protected health information, drivers license number, state identification number, credit card number(s), debit card number(s), address, telephone number(s), bank or other financial institution account numbers, account histories, or passwords; and

2.  other nonpublic personal information, in any format, as defined in **Privacy Regulations**.

**"Personal Information"** shall not include information that is lawfully made available to the general public for any reason, including, but not limited to, information lawfully obtained from federal, state or local government agencies.

Q.  **"Personal Injury"** means injury other than **Bodily Injury** arising out of one or more of the following offenses:

1.  wrongful entry or eviction, trespass, eavesdropping, false arrest or malicious prosecution;

2.  invasion, infringement, interference with the right to privacy or of publicity, including false light, public disclosure of private facts, intrusion or commercial appropriation of name or likeness; or

3.  defamation, slander or libel.

         * * *

S.  **"Privacy Event"** means:

1.  an unauthorized disclosure or loss of:
  a.  **Personal Information** in the care, custody or control of any **Insured** or **Service Provider**; or

      b.    corporate information in the care, custody or control of any **Insured** or **Service Provider** that is specifically identified as confidential or proprietary and which is protected under a written nondisclosure or other confidentiality agreement or other similar contract; or

   2.    a violation of any **Privacy Regulation**.

T.    **"Privacy Regulation"** means the following statutes and regulations, including any amendments thereto, associated with the control and use of personally identifiable financial, medical or other sensitive information:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) and Health Information Technology for Economic and Clinical Health Act;
2. Gramm-Leach-Bliley Act of 1999;
3. the California Security Breach Notification Act (CA SB 1386) and Massachusetts 201 CMR 17;
4. Identity Theft Red Flags under the Fair and Accurate Credit Transactions Act of 2003;
5. Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), but solely for alleged violations of unfair or deceptive acts or practices in or affecting commerce; and
6. other similar state and federal identity theft and privacy protection legislation that requires commercial entities that collect **Personal Information** to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that **Personal Information** has potentially been compromised.

U.    **"Privacy Wrongful Act"** means any actual or alleged act, error, omission, neglect or breach of duty by an **Insured** or by a **Service Provider** for services performed for or on behalf of the **Insured** that results in a **Privacy Event**.

V.    **"Professional Services"** means services:

1. provided by any **Insured** to others as a lawyer, mediator, arbitrator or notary public but solely for services on behalf of the **Named Insured** or Predecessor Firm designated in the Declarations; or

    2.    performed by any **Insured** as an administrator, conservator, receiver, executor, guardian, trustee, or in any other fiduciary capacity, but only if the act or omission in dispute is in the rendering of services ordinarily performed as a lawyer and then only to the extent that such services are on behalf of and inure to the benefit of the **Named Insured** or any Predecessor Firm designated in the Declarations.

*      *      *

Y.    **"Service Provider"** means a business the **Insured** does not own, operate, or control, but that the **Insured** hires for a fee pursuant to a written contract to perform services related to the conduct of the **Insured's** business, including but not limited to,
1. maintaining, managing, or controlling the **Insured's Computer Systems**;
2. hosting or facilitating the **Insured's** Internet website; or
3. providing other **Technology Services** to the **Insured**.

Z.    **"Unauthorized Access"** means the gaining of access to the **Insured's Computer System** by an unauthorized person or persons, or by an authorized person or persons in an unauthorized manner.

AA.    **"Unauthorized Use"** means the use of the **Insured's Computer System** by a person unauthorized by the **Insured** or a person authorized by the **Insured** who uses the **Insured's Computer System** for a purpose which is not intended by the **Insured**.

BB.    **"Wrongful Act"** means any actual or alleged negligent act, error, or omission committed or attempted in the rendering or failing to render **Professional Services** by any **Insured** on behalf of the **Named Insured,** including but not limited to **Personal Injury.**

*      *      *

### III.   EXCLUSIONS

This Policy shall not apply to any **Damages** or **Claims Expenses** incurred with respect to any **Claim:**

Letter: Lisa Bloom, Esq.
November 25, 2019
Page 12

    A.    based upon or arising out of any actual or alleged dishonest, criminal, intentional, malicious or fraudulent act, error or omission or any willful violation of any statute or regulation by an **Insured,** if a final adjudication adverse to such **Insured** establishes such a dishonest, criminal, intentional, malicious or fraudulent act, error or omission or willful violation.

\*    \*    \*

    C.    based upon or arising out of any written demand, litigation, proceeding, administrative action or hearing brought prior to or pending as of the Prior and Pending Litigation Date as stated in the Declarations as well as any future litigation, proceeding, administrative action or hearing based upon any such pending or prior litigation, proceeding, administrative action or hearing or derived from the same or similar essential facts or circumstances underlying or alleged in any such pending or prior litigation, proceeding, administrative action or hearing;

    D.    based upon or arising out of any circumstance, if written notice of such circumstance has been given under any policy of which this Policy is a direct or indirect renewal or replacement and if such prior policy affords coverage (or would afford such coverage except for the exhaustion of its limits of liability) for such **Claim**, in whole or in part, as a result of such notice;

\*    \*    \*

    H.    based upon or arising out of any actual or alleged discrimination, humiliation or harassment, including but not limited to a **Claim** based on an individual's race, creed, color, age, gender, national origin, religion, disability, marital status or sexual preference;

\*    \*    \*

**IX.    GENERAL CONDITIONS**

\*    \*    \*

    C.    **Application.** In issuing this Policy, the **Company** has relied upon the statements, representations and information contained in the **Application**. Every **Insured** acknowledges and agrees that all such statements, representations and information (i) are true and accurate, (ii) were made or

Letter: Lisa Bloom, Esq.
November 25, 2019
Page 13

> provided in order to induce the **Company** to issue this Policy, and (iii) are material to the **Company's** acceptance of the risk to which this Policy applies. If any of the statements, representations or information in the **Application** are not true and accurate, there shall be no coverage for any **Claim** under this Policy with respect to any **Insured Person** who knew, as of the effective date of the **Policy Period**, of such information that was not truthfully and accurately disclosed in the **Application.** The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage.

* * *

The policy is also amended by an endorsement, form no. AES PL 145 08 16, which provides as follows:

**MODIFIED PRIOR & PENDING EXCLUSION**

This endorsement modifies the insurance provided under the following:

**LAWYERS' PROFESSIONAL LIABILITY POLICY**

Section **III. EXCLUSIONS, C.** is deleted in its entirety and replaced with the following:

> **C.**  based upon, arising out of, or attributable to any written demand, litigation, proceeding, administrative action or hearing known or reasonably foreseen by any **Insured** brought prior to or pending as of the Prior and Pending Litigation Date as stated in the Declarations, as well as any future litigation, proceeding, administrative action or hearing based upon any such pending or prior litigation, proceeding, administrative action or hearing or derived from the same or similar essential facts or circumstances underlying or alleged in any such pending or prior litigation, proceeding, administrative action or hearing;

<u>Conclusions and disclaimers</u>

As noted above, Associated respectfully disclaims any duty to defend or indemnify you and The Bloom Firm against the claims made and damages sought in the McGowan complaint.  This is because there is no potential for liability covered under the Associated policy for the claims asserted in the McGowan complaint.  We explain more fully below.

Letter: Lisa Bloom, Esq.
November 25, 2019
Page 14

We first consider whether Associated owes you any duties to defend or indemnify you under the policy's insuring agreement, which extends coverage for liability claimed "for a **Wrongful Act**," defined in relevant part to refer to a "negligent act, error, or omission committed or attempted in the rendering or failing to render **Professional Services**," in turn defined to refer to services "provided by any **Insured** to others as a lawyer, …."

Applying this language here, we conclude that plaintiff McGowan seeks no damages from you based on services provided to others "as a lawyer." To the contrary, the McGowan complaint disavows any claim based on legal services provided by you but rather refers to "non-legal" services "such as reputation management" (Para. 14), which appears to be a form of public relations. It is on these latter allegations of non-legal services that McGowan bases her complaint.

In this regard, we understand that you also may have provided legal services to Weinstein or to Boies, in that the engagement letter does refer to non-specified "legal services," the December 2016 memo refers to a possible cease and desist letter, and the invoices provided include a few entries addressing discussion of such a letter and negotiation of contracts. None of these possible legal services, however, is mentioned in McGowan's complaint and we have no information showing that such services were negligently performed or that you face potential liability for such services. Because all of the facts alleged against you in the McGowan action relate to non-legal services by way of reputation management or public relations rather than services provided by you for others as a lawyer, we conclude that the policy's insuring agreement is not satisfied in the first instance.

We note as well that, of the eleven claims alleged against you, at most, two could implicate "negligent" conduct, as required in the policy's insuring agreement, even if potential liability for performance of legal services had been involved. Those two would be the seventh claim for invasion of privacy and the eleventh claim for negligent hiring and supervision. None of the remaining claims implicate coverage for negligence, and thus Associated respectfully disclaims any duties with respect to the first two claims for civil RICO violations, the third for violations of the Federal Wiretap Act, the fourth and fifth for fraudulent deceit and common law fraud, respectively, the sixth for violations of California's Bane Act, the eighth for commission of computer crimes, and the tenth for intentional infliction of emotional distress.

Each of these disclaimed counts would likewise be precluded from coverage by California's statutory willful acts exclusion under Insurance Code § 533, or by the policy's Exclusion A, quoted above, which applies to similar conduct.

Moreover, even if the insuring agreement had applied, we conclude that Exclusion H would preclude the potential for covered liability. Recall that as relevant here Exclusion H., applies to any claims "based upon or arising out of any actual or alleged … humiliation or harassment, …." Here, McGowan's complaint alleges that you conspired to "discredit [Weinstein's] accusers" (Para. 5) to ensure "that no one would believe her" (Para. 7), "to

undermine MCGOWAN's reputation"(Para. 8), and succeeded to the point that McGowan's "job opportunities vanished; and her emotional health cratered." (Para. 9.) As detailed earlier, this was allegedly accomplished by contacting McGowan though a sequence of Black Cube operatives working under false names and pretenses who gained her confidence and access to her manuscript. Black Cube, allegedly supervised by Bloom, allegedly pestered and persecuted McGowan and caused her a loss of dignity. The conduct qualifies as harassment or humiliation and would thus be excluded under Exclusion H. As against you, nothing else is alleged,the only potential for your liability depends on proof of such alleged conduct, however, Exclusion H., necessarily applies. Nor would it matter that you did not personally harass or humiliate McGowan. If you are held liable by reason of Black Cube's conduct, then your potential liability will have arisen from Black Cube's excluded conduct. Because your potential liability, if any, depends on the alleged harassment and humiliation committed by the alleged Black Cube inquiry into Bloom's manuscript and reputation, it necessarily falls within Exclusion H.

We also note that McGowan's allegations against Weinstein and perhaps against you have been subject to public attention for some time and we understand that McGowan may have made one or more prior demands for settlement. Accordingly, Associated reserves the right to further investigate and to assert that the McGowan complaint does not satisfy the requirement in the insuring agreement at I.A.(ii), quoted above, that "the **Insured** has no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy," i.e., before May 19, 2019. Alternatively, Associated reserves the right to disclaim under Exclusion C, quoted above, to the extent the McGowan action arises from a written demand before May 19, 2019. Alternatively, Associated reserves the right to disclaim or to rescind or reform the policy in whole or in part in reliance on the representation and warranty contained in your 2019 renewal application that no partner or principal was then "aware of any fact, circumstance, incident, error, situation, or accident that may result in a claim being made against" the Bloom Firm.

Finally, we have also considered the possibility of coverage under the insuring agreement for Network Security and Privacy Coverage. However,the terms and definitions quoted above and applicable to that coverage, focus on the insured's own custodial duties toward the personal information of others maintained in the insured's own computers. They do not address a scenario like that presented here, wherein you are alleged to have conspired, permitted, or participated in the intrusion into the plaintiff McGowan's computer to retrieve portions of the private manuscript then in process. Accordingly, we conclude that the McGowan action does not present the potential for liability that would be covered under the Network Security and Privacy Coverage.

This disclaimer is based upon the foregoing comments, as well as all of the terms, conditions, and exclusions contained in the relevant policy, together with all terms and exclusions implied as a matter of law. We would be pleased to review any additional facts or legal reasoning that you wish Associated to consider or that you believe may provide for coverage, or the potential for liability that would be covered, under the Associated policy. Please do not hesitate to provide these and any other facts and reasoning to the

Letter: Lisa Bloom, Esq.
November 25, 2019
Page 16

undersigned.  Please also let us know if you believe the facts asserted or positions taken in this letter are incorrect.

Please further note that, by reviewing the materials provided, or any materials, which you or others may yet provide, Associated has not waived but rather expressly reserves its rights to disclaim coverage on the same or additional grounds, or to reserve rights based upon additional grounds should it later appear that actual or potential coverage exists.

Finally, be advised that you are entitled to have the handling of this claim reviewed by the California Department of Insurance, Consumer Communications Bureau, 300 South Spring Street, South Tower, Los Angeles, CA  90013, telephone numbers 1-800-927-Help (4357) or 1-213-897-8921.

Very truly yours,

Carolyn Kang
Manager E&S Professional Liability
AmTrust Financial Services, Inc.
233 North Michigan Avenue
Chicago, IL 60601
(312) 577-7326
Carolyn.kang@amtrustgroup.com

Cc:    Vernon L. Ellicott (vernon@thebloomfirm.com, via email only)
       Braden Pollock (braden@thebloomfirm.com, via email only)
       Nathan Gonzalez (NGonzalez@CRCGroup.com, via email only)
       Jay Horoshak (jhoroshak@CRCGroup.com, via email only)
       Melissa Aguilera (Melissa@Modabinsurance.com, via email only)
       Timothy Jacobs (timothy.jacobs@amtrustgroup.com, via email only)